## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### (Beaufort Division)

| | |
|---|---|
| MAINLINE METALS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>JOSEPH PEARSON and<br>CAROLINA STEEL CORPORATION,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>: CIVIL ACTION NO. 9:23-cv-00545-DCN<br>:<br>:<br>:<br>:<br>:<br>: |

## CIVIL ACTION COMPLAINT

Plaintiff, Mainline Metals, Inc. ("Mainline Metals" or the "Company"), by and through its undersigned counsel, hereby files this Civil Action Complaint against Defendants, Joseph Pearson ("Pearson") and Carolina Steel Corporation ("Carolina Steel") (collectively, "Defendants"), and avers as follows:

## INTRODUCTION

1.    Mainline Metals seeks injunctive relief and monetary damages against Defendants for their misappropriation of Mainline Metals' trade secrets and to redress the fact that Pearson – who was employed by Mainline Metals as a Sales Executive for nearly ten years – surreptitiously formed and began competing with Mainline Metals through his new business, Carolina Steel, while he was still employed and being compensated by Mainline Metals.  Despite being instructed to cease and desist from their unlawful conduct by Mainline Metals' legal counsel, Pearson and his new business, Carolina Steel, have failed to do so, and should they continue to go unchecked, Mainline Metals will lose a significant and presently indeterminable amount of revenue, along with established customer relationships, good will, and market share that it may never recover.

2.      Accordingly, Mainline Metals comes now to this Honorable Court to protect its legitimate business interests in its customer relationships and goodwill, which Defendants seek to destroy through their egregious and unjustified conduct.

## PARTIES

3.      Mainline Metals is a Pennsylvania Corporation with its principal place of business located at 401 E. Elm Street, Suite 202, Conshohocken, PA 19428.

4.      Pearson is an adult individual who resides within the State of South Carolina at 9 Belfair Point Drive, Bluffton, SC 29910.

5.      Carolina Steel is a Florida corporation with its principal place of business located at 1101 Miranda Lane, Suite 131, Kissimmee, FL 34741, as well as a registered business address a 9 Belfair Point Drive, Bluffton, SC 29910 – the same address as Pearson's personal residence.

6.      Pearson is Carolina Steel's President, Secretary, and Director and, as set forth in its Articles of Incorporation, Carolina Steel does not have any other Officers or Directors.

## JURISDICTION AND VENUE

7.      This Court may properly maintain jurisdiction over Defendants because: (i) Pearson resides in South Carolina; (ii) Carolina Steel maintains a registered business address in South Carolina; and (iii) Defendants' contacts with South Carolina are sufficient for the exercise of jurisdiction over Defendants, satisfying the standard set forth by the U.S. Supreme Court in *International Shoe Co. v. State of Washington*, 326 U.S. 310 (1945).

8.      Pursuant to 28 U.S.C. § 1331, the Court has original subject matter jurisdiction over Count I of this Complaint because said Count arises under the laws of the United States.

9.      Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Counts II and III of this Complaint.

10.     The Court also has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because: (i) Mainline Metals is a citizen of the Commonwealth of Pennsylvania, Pearson is a citizen of South Carolina, and Carolina Steel is a citizen of Florida, and thus, Mainline Metals is diverse from each of the Defendants; and (ii) the amount in controversy exceeds $75,000, exclusive of attorneys' fees and costs.

## FACTS

### A.     Mainline Metals' Specialized Business and Pearson's Position of Trust

11.     Founded in 1986, Mainline Metals specializes in buying and selling steel products to a wide range of customers in and throughout the United States in interstate commerce, including, but not limited to, hot rolled (HRC) steel, hot rolled pickled & oiled steel, cold rolled (CR) steel, cold rolled full hard steel,  steel sheet, steel plate, steel channel, steel square tube, galvanized sheet metal, galvanized (HDG) coil, galvalume coil, galvanneal coil, painted product, and wide flange beam (collectively, the "Products").

12.     Mainline Metals also provides steel services to its customers, including, but not limited to, slitting, cutting to length, shape correction, pickling, and painting (collectively, the "Services").

13.     The Products and Services sold by Mainline Metals are not subject to public bidding, and instead, it is necessary for Mainline Metals to rely upon the supplier and customer relationships and goodwill that it is has developed over multiple decades in order to have any success in the marketplace, which is highly competitive.

14.     The non-public pricing that Mainline Metals has negotiated with its suppliers and customers is critical to Mainline Metals' business and sets the Company apart from its competitors.

15.    As reflected by his own LinkedIn Profile, in May 2013, Pearson became employed by Mainline Metals as a Sales Executive, who was responsible for making sales, generating new business, and ensuring that Mainline Metals' existing customer relationships remained intact.  (A true and correct copy of Pearson's LinkedIn Profile is attached as Ex. 1).

16.    Pearson was responsible for "Carbon Steel Sales, Purchasing & Distribution of Hot Roll, Hot Roll Pickled Oiled, Cold Roll and coated products throughout the United States" during his employment as a Sales Executive with Mainline Metals.  (Ex. 1 at p. 1).

17.    Pearson continued to hold the position of Sales Executive with Mainline Metals for almost ten (10) years, until the cessation of his employment on January 18, 2023.

18.    Solely for the purpose of performing his job duties as a Sales Executive with Mainline Metals, Pearson was entrusted with a substantial amount of confidential information and trade secrets belonging to Mainline Metals, including: (i) information contained in and related to Mainline Metal's client records, financial transactions, business strategies, software systems, customer lists, invoices, client names and information, marketing strategies, financial information, personal information regarding employees, software and computer applications, equipment and inside information belonging to Mainline Metals; (ii) sales records and reports, marketing and business strategies and plans, and product development information; (iii) pricing information related Mainline Metals suppliers and customers; (iv) Mainline Metals' contractual terms with its suppliers, customers, and third party vendors; (v) Mainline Metals' bid proposals and purchase orders; and (vi) information related to Mainline Metals' profits, profit margins, and revenue (collectively, the "Confidential Information").

19.    During his employment with Mainline Metals, Pearson was required to hold Mainline Metals' Confidential Information in strict confidence, for the sole benefit of Mainline Metals, and not for any other person or entity, especially any competitor.

20.    Pearson also used Mainline Metals' Confidential Information to formulate and submit bid proposals and purchase orders to suppliers, customers, and customer prospects on behalf of Mainline Metals, and he was required to do so using the Company e-mail address assigned to him by Mainline Metals.

21.    At no time was Pearson authorized to use his personal e-mail address to perform any work on behalf of Mainline Metals.

22.    Further, like all of Mainline Metals' employees – Pearson was required to comply with Mainline Metals' written "Non-Disclosure/Confidential Information" and "Ethics" policies set forth in Mainline Metals' Employee Handbook, which provide, in pertinent part:

### NON-DISCLOSURE/CONFIDENTIAL INFORMATION

Information is an integral component of all of our client relationships and shall be protected from unauthorized access, disclosure, destruction, modification, or loss, whether accidental or intentional. Authorization for access to information shall be based on the sensitivity of the information and the user's need-to-know. Company information must be used only for authorized business purposes. This applies equally to printed information, whether generated manually or by automated means, and to information stored and accessible by electronic or other means. Information includes, but is not limited to client records, plans, financial transactions, business strategies, software systems, customer lists, invoices and Company correspondence. During the course of your employment you will be exposed to confidential information about the Company. The protection of this information, which includes confidential business information, is crucial to our interests and our success. Such information includes, but is not limited to the following examples: client names and information, marketing strategies, financial information, personal information regarding employees, software and computer applications, equipment and inside information, etc…

**ETHICS POLICY**

>…The confidentiality of trade secrets, proprietary information, and similar confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.) about the Company or operations, or that of our customers or partners, is to be treated with discretion and only disseminated on a need-to-know basis…

(*See* Ex. 2, true and correct excerpts from Mainline Metals' Employee Handbook).

23.    Additionally, at Section 2.2, Mainline Metals' Employee Handbook prohibits the unauthorized "[d]isclosure of Company trade secrets and proprietary and confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development information, customer lists, patents, trademarks, etc.) of the Company or its customers, contractors, suppliers, or vendors." (Ex. 2 at § 2.2).

24.    As set forth at Section 2.6 of Mainline Metal's Employee Handbook, upon being separated on January 18, 2023, Pearson was also required to immediately return to Mainline Metals any and all company property and information, including, but not limited to any "written documentation pertinent to company business operations." (Ex. 2 at § 2.6).

25.    By implementing and enforcing the aforesaid policies, along with restricting access to its Confidential Information by using password protected computer systems, Mainline Metals took reasonable steps to safeguard and ensure that its Confidential Information was held in the strictest of confidence by its employees who were entrusted with that Confidential Information, including by Pearson.

**B.    Pearson's Violations of Company Policy and Deceptive Misrepresentations**

26.    On December 22, 2022, Mainline Metals was forced to issue Pearson a formal written warning (the "12/22 Written Warning"), upon learning that Pearson had violated Mainline

Metals' "Non-Disclosure/Confidential Information" and "Ethics" Policies by exporting files with

Confidential Information belonging to Mainline Metals from his company's computer network,

without authority to do so. (A true and correct copy of the 12/22 Written Warning is attached as

Ex. 3).

27.      Specifically, in late November 2022, Pearson improperly exported the following

files from the Company's secured computer network:

- **ClosedTags-Xport.csv:** containing customer information, product specifications (based on customer needs and preferences), and pricing data;

- **ActiveTags-Xport.csv:** containing customer information, product specifications (based on customer needs and preferences), and pricing data;

- **PSOpenNewEmail.eml:** containing a customer invoice, which includes customer information, product specifications (based on customer needs and preferences), and pricing data;

- **CustomerProfile-Xport.csv:** containing the entire customer profile for a Mainline Metals customer account, showing unique product identifiers and pricing data; and

- ***VendorMntExplorer-Xport.csv:*** *containing a comprehensive list of all of the Company's customers, vendors, and other contacts, complete with contact information that could be used to the detriment of the Company to solicit these contacts to terminate, diminish, or materially alter in a manner harmful to the Company their relationship with the Company (all developed with decades of investment from the Company).*

(Ex. 3 at pp. 1-2).

28.      In the 12/22 Written Warning, Mainline Metals directed Pearson to: (i) return all of

the files identified above; (ii) return all files and materials (and any copies thereof) exported from

Mainline Metals' computer systems or networks; and (iii) certify in writing that he had returned to

Mainline Metals and had not retained any copies of any Company information or data outside of secure Mainline Metals computer systems or networks. (*Id.* at p. 4).

29.    On December 28, 2022, Pearson represented to Mainline Metals via e-mail that he "deleted every copy of the Company documentation that [he] ha[d] been asked to delete." (A true and correct copy of Pearson's 12/28/22 e-mail is attached as Ex. 4).

30.    As set forth below, Pearson's representation that he had "deleted every copy of the Company documentation that [he] ha[d] been asked to delete" was not only disingenuous, but immediately upon sending his e-mail on December 28, 2022, Pearson began stealing and funneling additional files and materials containing Mainline Metals' Confidential Information to himself, as well as actively competing with Mainline Metals, all while he was still employed.

C.    **Pearson's Surreptitious Efforts to Compete with Mainline Metals and Theft of Mainline Metals' Confidential Information**

31.    On January 18, 2023, Pearson ceased being employed by Mainline Metals as a Sales Executive and Mainline Metals demanded that he return any and all files and materials within his possession, which contain any Confidential Information belonging to Mainline Metals.

32.    Mainline Metals also directed Pearson to return his Company-provided computer (an Apple Mac Mini) with all Company files intact.

33.    In connection with his separation, Mainline Metals severed Pearson's access to all of its Company secured computer network and systems.

34.    Despite Mainline Metals' directive for Pearson to return his Company-provided computer with all Company files intact, instead, Pearson deleted all of the files stored on his Company-provided computer before returning it to the Company.

35.    Based upon his prior violations of Company policy (for which he received the 12/22 Written Warning), in order to further safeguard its Confidential Information from unauthorized

disclosure, upon terminating his employment, Mainline Metals conducted an internal investigation to determine the extent to which Pearson fully complied with the 12/22 Written Warning.

36.     That investigation revealed that despite his written representations and assurances, Pearson had not fully complied with the 12/22 Written Warning.

37.     Pearson did the opposite – almost immediately after he received the 12/22 Written Warning on December 28, 2022, Pearson embarked upon a campaign to misappropriate files and materials containing Mainline Metals' Confidential Information, and he continued to do so through for the next several weeks leading up to the cessation of his employment on January 18, 2023.

38.     For example, in late December 2022 and early January 2023, Pearson forwarded at least twenty (20) different e-mails from his Company e-mail address to his personal e-mail address (joepearson1@aol.com), including e-mails attaching files with, among other things: (i) customer-specific bid proposals and purchase orders; (ii) pricing information for the various Products that Mainline Metals buys from its suppliers and sells to its customers; (iii) information related to customer specifications and needs; and (iv) information related to bids that Mainline Metals was in the process of submitting for transactions, all of which constitutes Confidential Information.

39.     To make matters worse, on the very same day that he wrote to Mainline Metals and represented that he had complied with the 12/22 Written Warning, without approval to do so, Pearson accessed, downloaded, and printed a copy of his entire customer list (the "12/28/22 Customer List") using Mainline Metals' Sales Dashboard to which access is restricted and was shared with Pearson solely for the purposes of performing his duties on behalf of Mainline Metals.

40.     Then, on January 4, 2023 – while he was still actively employed by Mainline Metals as a Sales Executive – Pearson caused Articles of Incorporation to be filed for Carolina Steel.  (A true and correct copy of the 1/4/23 Articles of Incorporation are attached as Ex. 5).

41.     According to his own LinkedIn Profile, since January 2023, Pearson has been both the "Owner" of and a "Sales Executive" for Carolina Steel, and as set forth above, Pearson is also Carolina Steel's President, Secretary, and sole Director.  (Ex. 1 at p. 1; Ex. 5).

42.     In his own LinkedIn Profile Pearson, represents that through Carolina Steel, he is engaging in "Sales and Purchasing at International IMPEX."  (Ex. 1 at p. 1).

43.     According to its website, International Impex, Inc. ("Impex") is "an organization of seasoned steel professionals, all working as a team to supply our customer base with the absolute lowest world coil prices," and which – *much like Mainline Metals* – "deal[s] in all Ferrous Coil Products: HR, HRP&O, CR, and the full range of Zinc coated products."

44.     In addition to revealing that Pearson had been taking Confidential Information from Mainline Metals, the Company's investigation has revealed that on December 2022 *(at the latest)*, Pearson, alone and/or through Carolina Steel, began competing with Mainline Metals by relaying business opportunities and Confidential Information to Impex while he was still employed by Mainline Metals.

45.      Although the full extent of Pearson's efforts to compete with Mainline Metals while he was still employed cannot yet be fully determined, *at a minimum*, Pearson did the following for his own benefit and to Mainline Metals' detriment:

(a)     Starting as far back as December 2022, Pearson established a relationship with Impex and used his Company e-mail address to correspond with Impex about sourcing steel products for customers, including with an itemized list setting forth the material needs of Impex customers;

(b)     While still employed by Mainline Metals and using his Company-provided computer, Pearson sent at least one e-mail to Impex about selling steel products on behalf of Impex;

(c)     On January 5, 2023, using his Company-provided computer, Pearson sent an e-mail to Keith D. Price ("Price"), the President of Impex, regarding orders being made for Impex steel products;

(d)     On January 6, 2023, using his Company-provided computer, Pearson sent an e-mail to Price setting forth the needs of a customer located in Georgia and asking Impex to purchase steel material for that customer;

(e)     On January 11, 2023, using his Company-provided computer, Pearson and Price exchanged a series of e-mails, which also included at least one file related to a customer.

46.     In short, Pearson used Company resources to source customers, deals, and transactions for Impex during his employment with Mainline Metals, without approval to do so.

47.     By doing so, Pearson usurped business opportunities from Mainline Metals for his own benefit, the benefit of his newly-formed business, Carolina Steel, and for the benefit of Impex with which, upon information and belief, Pearson and/or Carolina Steel have been affiliated since December 2022, *at the latest.*

48.     Pearson's efforts to compete with Mainline Metals during his employment run afoul of South Carolina law and Section 2.1 of Mainline Metal's Employee Handbook, which provides that any "[o]utside employment that creates a conflict of interest or that affects the quality or value of your work performance or availability to the Company is prohibited."  (Ex. 2 at § 2.1).

### D.    Defendants' Ongoing Refusal to Cease & Desist Their Unlawful Conduct

49.    After discovering that Pearson had: (i) started and began operating a competing business while he was still actively employed as a Sales Executive for Mainline Metals; and (ii) funneled Mainline Metals' Confidential Information to himself for the benefit of Carolina Steel and/or Impex, on January 25, 2023, Mainline Metals' legal counsel sent a letter to Pearson (the "Cease & Desist Letter"), demanding that he immediately cease and desist from his unlawful conduct. (True and correct copies of the Cease & Desist Letter to Pearson and corresponding Federal Express Label are attached as Exhibits 6 and 7, respectively).[1]

50.    As part of the Cease & Desist Letter to Pearson, Mainline Metals' legal counsel asked Pearson to provide a signed Certification of Compliance, which is attached to the Cease & Desist Letter as Exhibit D, to confirm, *inter alia*, that Pearson returned to Mainline Metals any and all files and materials containing any Confidential Information belonging to Mainline Metals. (Ex. 6 at "Exhibit D").

51.    To date, however, Pearson has not provided any response to the Cease & Desist Letter, and instead, upon information and belief, he continues to use the Confidential Information which he stole – including, in particular, Mainline Metal's pricing information and the 12/28/22 Customer List – to solicit and attempt to divert business opportunities away from Mainline Metals.

52.    Without an injunction from the Court to put an end to Defendants' unlawful conduct, Mainline Metals will continue to suffer irreparable harm, including loss of good will, reputation, and an indeterminate amount of business and volume from customers.

---

[1] For the sake of judicial economy, Exhibits A-C to the Cease & Desist Letter that was transmitted to Pearson are omitted. On January 25, 2023, Mainline Metals' legal counsel also transmitted a separate letter to Impex. (True and correct copies of the letter transmitted to Impex and corresponding Federal Express Label are attached as Exhibits 8 and 9, respectively). Mainline Metals reserves its right to pursue any legal or equitable relief against Impex.

53.     Moreover, without intervention by the Court, Defendants will continue to utilize Confidential Information belonging to Mainline Metals for their own benefit and to the detriment of Mainline Metals, the full extent of which cannot be readily determined.

54.     In sum, Pearson's unlawful conduct and unauthorized retention of Mainline Metals' Confidential Information threatens to destroy Mainline Metals' business, which it has spent many years developing.

**COUNT I**
**THE DEFEND TRADE SECRETS ACT**
**(Mainline Metals v. Defendants)**

55.     Mainline Metals incorporates the foregoing Paragraphs of this Complaint as though set forth at length herein.

56.     The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*., broadly defines the term "Trade Secrets" to include all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing, where: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

57.     Mainline Metals' trade secrets are comprised of, *inter alia*: (i) those materials meeting the definition of "Confidential Information" in Mainline Metals' written "Non-Disclosure/Confidential Information Policy," including any information contained in or related to

Mainline Metal's client records, financial transactions, business strategies, software systems, customer lists, invoices, client names and information, marketing strategies, financial information, personal information regarding employees, software and computer applications, equipment and inside information belonging to Mainline Metals; (ii) sales records and reports, marketing and business strategies and plans, and product development information; (iii) pricing information related Mainline Metals suppliers and customers; (iv) Mainline Metals' contractual terms with its suppliers, customers, and third party vendors; (v) Mainline Metals' bid proposals and purchase orders; and (vi) information related to Mainline Metals' profits, profit margins, and/or revenue, all of which were acquired and developed at great cost to Mainline Metals and constitute "Trade Secrets" within the meaning of that term under the DTSA.

58.     These trade secrets would be difficult, expensive, and time-consuming to duplicate independently, if they could be at all.

59.     These trade secrets are the exclusive property of Mainline Metals, have been maintained in secrecy by Mainline Metals, are not known to the public or within Mainline Metals' industry and are of great pecuniary value to Mainline Metals.

60.     Mainline Metals entrusted its trade secrets to Pearson as a Sales Executive and for the exclusive purpose of benefitting Mainline Metals.

61.     Mainline Metals derives independent economic value from its trade secrets not being generally known or readily ascertainable by proper means to third parties that could obtain economic value from the use of Mainline Metals' trade secrets.

62.     Pearson had a duty to refrain from misusing or misappropriating Mainline Metals' trade secrets that were entrusted to him because they are exclusive property of Mainline Metals.

63.     Pearson breached his duty to Mainline Metals by intentionally, knowingly, and by wrongful and improper means, misappropriating Mainline Metals' trade secrets for his personal benefit and the benefit of his new business, Carolina Steel, as well as Impex.

64.     The DTSA expressly authorizes this Court to enjoin Defendants from any actual or threatened misappropriation of Mainline Metals' trade secrets.

65.     Furthermore, unless Defendants are enjoined from using and disclosing Mainline Metals' trade secrets, the value of a substantial part of Mainline Metals' business will be irreparably harmed.

66.     As a direct and proximate result of Defendants' misappropriation of Mainline Metals' trade secrets, Mainline Metals has suffered, and continues to suffer, immediate irreparable injury, for which Mainline Metals has no adequate remedy at law.

67.     In addition to the irreparable injury described above, as a direct and proximate result of Defendants' wrongful conduct, Mainline Metals has suffered and/or will suffer actual and/or consequential damages, including loss of competitive business advantage, opportunity, and/or expectancy.

68.     Defendants have acted with wanton, willful, malicious, and/or reckless indifference, and as a result, is liable for punitive damages under the DTSA.

**WHEREFORE,** Mainline Metals demands the entry of judgment in its favor and against Defendants, providing the following relief:

a)      A permanent injunction ordering that: (i) Defendants, and all other persons or entities acting in active concert or participation with Defendants, be permanently enjoined and restrained from possessing, using, copying, and/or disclosing any Confidential Information belonging to Mainline Metals; (ii) Defendants, and all other persons or entities acting in active

concert or participation with Defendants, until twelve (12) months following the entry of the permanent injunction, be enjoined and restrained from either soliciting or accepting business from any customers identified in the 12/28/22 Customer List; (iii) Defendants immediately return to Mainline Metals any and all files and materials that contain any Confidential Information belonging to Mainline Metals that are within their possession, custody, and/or control; and (iv) Defendants to provide Mainline Metals with a Certification of Compliance, signed under oath by Defendants, confirming that Defendants have: (x) returned to Mainline Metals any and all Confidential Information within their possession, custody, and/or control; and (y) permanently deleted any files and materials containing any such Confidential Information from any and all computers, electronic devices, and cloud accounts within their custody, possession, and/or control;

b)      Compensatory damages, including without limitation lost profits and all damages resulting from Defendants' breaches of their statutory and common law obligations;

c)      An accounting and equitable disgorgement for a payment to Mainline Metals of all profits and earnings of Defendants' resulting from their misconduct;

d)      Statutory and exemplary damages for violation of the DTSA and SCTSA;

e)      Attorney's fees as provided under the DTSA and SCTSA;

f)      Punitive damages against both Pearson and Carolina Steel; and

g)      Such other or further relief as the Court may determine is necessary to provide complete relief for Mainline Metals resulting from Defendants' violations of law.

## COUNT II
## THE SOUTH CAROLINA TRADE SECRETS ACT
### (Mainline Metals v. Defendants)

69.      Mainline Metals incorporates the foregoing Paragraphs of this Complaint as though set forth at length herein.

70.    The South Carolina Trade Secrets Act ("SCTSA"), SC Code § 39-8-10, *et seq.*, broadly defines the term "Trade Secret" to include: (a) information including, but not limited to, a formula, pattern, compilation, program, device, method, technique, product, system, or process, design, prototype, procedure, or code that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and (b) ….a simple fact, item, or procedure, or a series or sequence of items or procedures which, although individually could be perceived as relatively minor or simple, collectively can make a substantial difference in the efficiency of a process or the production of a product, or may be the basis of a marketing or commercial strategy…."

71.    Mainline Metals' Confidential Information constitute "Trade Secrets" as that term is broadly defined under the SCTSA.

72.    These trade secrets would be difficult, expensive, and time-consuming to duplicate independently, if they could be at all.

73.    These trade secrets are the exclusive property of Mainline Metals have been maintained in secrecy by Mainline Metals, are not known to the public or within Mainline Metals' industry and are of great pecuniary value to Mainline Metals.

74.    Mainline Metals entrusted its trade secrets to Pearson as a Sales Executive for the exclusive purpose of benefitting Mainline Metals.

75.    Mainline Metals derives independent economic value from its trade secrets not being generally known or readily ascertainable by proper means to third parties that could obtain economic value from the use of Mainline Metals' trade secrets.

76.     Pearson had a duty to refrain from misusing or misappropriating Mainline Metals' trade secrets that were entrusted to him because they are exclusive property of Mainline Metals.

77.     Pearson breached his duty to Mainline Metals by intentionally, knowingly, and by wrongful and improper means, misappropriating Mainline Metals' trade secrets for his personal benefit and the benefit of his new business, Carolina Steel, as well as Impex.

78.     The SCTSA expressly authorizes this Court to enjoin Defendants from any actual or threatened misappropriation of Mainline Metals' trade secrets.

79.     Furthermore, unless Defendants are enjoined from using and disclosing Mainline Metals' trade secrets, the value of a substantial part of Mainline Metals' business will be irreparably harmed.

80.     As a direct and proximate result of Defendants' misappropriation of Mainline Metals' trade secrets, Mainline Metals' has suffered, and continues to suffer, immediate irreparable injury for which Mainline Metals has no adequate remedy at law.

81.     In addition to the irreparable injury described above, as a direct and proximate result of Defendants' wrongful conduct, Mainline Metals has suffered and/or will suffer actual and/or consequential damages, including loss of competitive business advantage, opportunity, and/or expectancy.

**WHEREFORE,** Mainline Metals demands the entry of judgment in its favor and against Defendants, providing the following relief:

a)     A permanent injunction ordering that: (i) Defendants, and all other persons or entities acting in active concert or participation with Defendants, be permanently enjoined and restrained from possessing, using, copying, and/or disclosing any Confidential Information belonging to Mainline Metals; (ii) Defendants, and all other persons or entities acting in active

concert or participation with Defendants, until twelve (12) months following the entry of the permanent injunction, be enjoined and restrained from either soliciting or accepting business from any customers identified in the 12/28/22 Customer List; (iii) Defendants immediately return to Mainline Metals any and all files and materials that contain any Confidential Information belonging to Mainline Metals that are within their possession, custody, and/or control; and (iv) Defendants to provide Mainline Metals with a Certification of Compliance, signed under oath by Defendants, confirming that Defendants have: (x) returned to Mainline Metals any and all Confidential Information within their possession, custody, and/or control; and (y) permanently deleted any files and materials containing any such Confidential Information from any and all computers, electronic devices, and cloud accounts within their custody, possession, and/or control;

b)    Compensatory damages, including without limitation lost profits and all damages resulting from Defendants' breaches of their statutory and common law obligations;

c)    An accounting and equitable disgorgement for a payment to Mainline Metals of all profits and earnings of Defendants' resulting from their misconduct;

d)    Statutory and exemplary damages for violation of the DTSA and SCTSA;

e)    Attorney's fees as provided under the DTSA and SCTSA;

f)    Punitive damages against both Pearson and Carolina Steel; and

g)    Such other or further relief as the Court may determine is necessary to provide complete relief for Mainline Metals resulting from Defendants' violations of law.

## COUNT III
## **<u>BREACH OF EMPLOYEE DUTY OF LOYALTY</u>**
### **(Mainline Metals v. Pearson)**

82.    Mainline Metals incorporates the foregoing Paragraphs of this Complaint as though set forth at length herein.

83. Pursuant to Pearson's employment relationship with Mainline Metals as a Sales Executive, he was placed in a position of trust regarding Mainline Metals' operations, suppliers, customers, and Confidential Information.

84. Based upon his employment relationship and position of trust with Mainline Metals as a Sales Executive, under South Carolina law, Pearson owed a duty of loyalty to act solely for Mainline Metals' benefit during his employment therewith.

85. Nonetheless, while Pearson was still employed by Mainline Metals as a Sales Executive, without Mainline Metals' knowledge or consent, Pearson surreptitiously: (i) started Carolina Steel to compete with Mainline Metals for the same customers served by Mainline Metals; (ii) for his own benefit and/or the benefit of Carolina Steel, relayed competitive business opportunities and information to Impex; and (iii) accessed, copied, and funneled Mainline Metals' Confidential Information to himself for the purpose of competing with Mainline Metals through his new business, Carolina Steel, as well as for the benefit of Impex.

86. Pearson has used and will continue to use Mainline Metals' Confidential Information for the benefit of himself, Carolina Steel, and Impex.

87. Pearson's aforementioned misconduct constitutes a breach of his employee duty of loyalty to Mainline Metals, as a Sales Executive employed by Mainline Metals, who was entrusted with access to Mainline Metals' Confidential Information for the sole benefit of Mainline Metals.

88. As a direct and proximate result of Pearson's wrongful conduct described herein, Mainline Metals has sustained and will continue to sustain immediate and irreparable harm and injury for which it has no adequate remedy at law.

89. In addition to the irreparable injury described above, as a direct and proximate result of Pearson's wrongful conduct, Mainline Metals has suffered and/or will suffer actual and/or

consequential damages, including loss of competitive business advantage, opportunity, and/or expectancy.

90.    Pearson has acted with wanton, willful, malicious, and/or reckless indifference, and as a result, is liable for punitive damages.

**WHEREFORE,** Mainline Metals demands the entry of judgment in its favor and against Defendants, providing the following relief:

a)    A permanent injunction ordering that: (i) Defendants, and all other persons or entities acting in active concert or participation with Defendants, be permanently enjoined and restrained from possessing, using, copying, and/or disclosing any Confidential Information belonging to Mainline Metals; (ii) Defendants, and all other persons or entities acting in active concert or participation with Defendants, until twelve (12) months following the entry of the permanent injunction, be enjoined and restrained from either soliciting or accepting business from any customers identified in the 12/28/22 Customer List; (iii) Defendants immediately return to Mainline Metals any and all files and materials that contain any Confidential Information belonging to Mainline Metals that are within their possession, custody, and/or control; and (iv) Defendants to provide Mainline Metals with a Certification of Compliance, signed under oath by Defendants, confirming that Defendants have: (x) returned to Mainline Metals any and all Confidential Information within their possession, custody, and/or control; and (y) permanently deleted any files and materials containing any such Confidential Information from any and all computers, electronic devices, and cloud accounts within their custody, possession, and/or control;

b)    Compensatory damages, including without limitation lost profits and all damages resulting from Defendants' breaches of their statutory and common law obligations;

c)    An accounting and equitable disgorgement for a payment to Mainline Metals of all profits and earnings of Defendants' resulting from their misconduct;

d)    Statutory and exemplary damages for violation of the DTSA and SCTSA;

e)    Attorney's fees as provided under the DTSA and SCTSA;

f)    Punitive damages against both Pearson and Carolina Steel; and

g)    Any further relief which the Court shall deem just and proper.

## **DEMAND FOR JURY TRIAL**

Mainline Metals respectfully requests a trial by jury on all claims so triable.

Respectfully submitted,

**Nelson Mullins Riley & Scarborough LLP**

*/s/ Debbie W. Durban*
Debbie Whittle Durban, Esq. (No.7391)
Meridian, 17th Floor
1320 Main Street
Columbia, SC 29201
T:  (803) 255-9465
F:  (803) 256-7500
E:  debbie.durban@nelsonmullins.com

*Attorney for Plaintiff, Mainline Metals, Inc.*